The next matter, Case No. 14-1603, AngioDynamics, Inc. v. Biolitec AG, et al. Well, Mr. Griffith, you're up again. Thank you, Your Honor. And may I reserve two minutes for this one as well? You may. Well, let me begin. We've raised several issues, but let me begin with the district court's decision to enter a discovery default, primarily based on Dr. Neuberger's failure to appear for the continuation of his deposition. And our principal argument... Don't we normally review entry of default for discovery violations for abuse of discretion? Yes. Yes, Your Honor. And so the issue that we've raised here is that the district court abused its discretion because the real reason that the district court entered the default was not so much discovery, but further sanction for contempt. Judge Callietta, you had raised in the earlier argument, how do you measure the excessiveness or the reasonableness of the contempt sanctions? Well, in this case, not only do we have an arguable $167 million coercive sanction, which we say should be characterized as criminal under the Bagwell decision, but in addition, there's now a default judgment for $75 million. And that really brings this up to a huge level, and it really is bootstrapping this case to really prevent the defendants from even having their day in court on very problematic claims. But if you don't come to your own... He's conceded the court has jurisdiction over him. Yes. And he's supposed to come to a deposition, and he asks the court for permission not to, and it's denied, so he knows the court wants him there, and then he just refuses to come. And he then makes clear that he's never going to come. So I would think almost any court on that record, where someone hasn't come, won't come, says they're not going to come no matter what the court does, would enter a default judgment. We think it's an abusive discretion because it was not the first time he came for the deposition that he refused. He came. He came and spent seven hours in Springfield being deposed. But the deposition wasn't over. He was supposed to be back, and he, unilaterally, and he seems to have an attitude that he can craft the rules and judgments to fit his own purposes when actually the way it works is the court gets to decide whether you appear for a deposition or not. Of course, Your Honor. But for the arrest warrant, there's no question that he would have come back when his motions to have it by videotape in Europe were denied. Wasn't there also a discovery problem at that first deposition that he had not produced some of the documents which were necessary for the deposition, or at least which the plaintiff thought were necessary and were properly discoverable? They weren't being withheld, Your Honor. It was the e-mails, and there was an ongoing process between counsel to come up with some search terms that would result in a reasonable, relevant, and not overly voluminous set of e-mails. But what was the message? He doesn't want to go to the deposition. The court thinks he should. I think the court gets to make that judgment. It makes the judgment. He then says he wasn't going to come. What is the court supposed to do then other than enter default judgment? Enter a less draconian sanction. So a contempt sanction? No, Your Honor, because in essence it's the same thing. Like what? Requiring the deposition, all of the deposition costs to be paid for by the defendants. Even in Germany? In Europe. And it would succeed to his position? Well, think of it this way, Your Honor. But for the contempt and the arrest warrant, isn't it true that a defendant in this situation who has voluntarily come from his home in Europe to attend a day-long deposition, after telling the plaintiff that, look, we recognize we still need e-mails to produce. Would you please allow us to come later after the e-mails are produced? And the plaintiff says, no, we want you over here now. So when he came over, it was already known that he was going to have to continue the deposition. So I think you're saying is that you want us to rule that the court had to accede to his position, that the deposition would be taken in Germany and he would cover the costs of people coming over there. I would say that would be a reasonable ruling because it is a sanction that is alternative. It's an alternative sanction to impose those costs on the defendants. It's an alternative the court doesn't have to necessarily follow. The court can decide reasonably what it thinks is appropriate under the circumstances. Maybe I misread this, but I thought I read somewhere that he had said, I'm not going to testify anyway. No, that's not true, Your Honor. In fact, just the opposite. We made, I think, at least two motions seeking a continuance of the deposition until the contempt issue was resolved and or to have it done by videotape or in live in Europe. I'm sorry, was that a representation that if the contempt is upheld, your client would have appeared for deposition in this country? Your Honor, no, that was not. Then what was the basis of the motion? It seems that it could be treated as a frivolous delaying tactic. Well, Your Honor, the basis of the motion was that it was actually a. . . Don't decide until the contempt is. . . It was based on the criminal contempt proceeding. The district court had referred this matter for criminal contempt, something that we frankly didn't quarrel with because we believe that to the extent there was contempt here, it should be dealt with in the context of a criminal contempt proceeding. And because of that, a U.S. attorney was assigned and was investigating. And in the light of that, the motion was made to delay the deposition pending that criminal investigation because many of the questions Dr. Neuberger would probably be advised by his criminal counsel not to answer on the grounds of the Fifth Amendment. And so that was the basis of that motion. It was denied by the magistrate judge. And then in response to the plaintiff's motion for discovery default, there was a cross motion recognizing that the attempt to stay the deposition until the criminal contempt proceeding was over had been denied. The cross motion sought either videotape or in person in Europe at defendant's cost. And so we believe that was reasonable and we believe that in this context where we have this dispute between the defendant and the district court over contempt, if the issue is really providing the plaintiff with the information they need in order to have a fair trial, what would be wrong with a videotaped deposition? The way the rules work, you don't get to decide that. That's what we have a judge for. And he decided it and your guy said, tough luck, I'm not going to comply with it. You're right, Your Honor. And in this case... So what's the judge to do at that point? Say, you want us to say, the judge should say, I give up, I lose, I don't have the power of a federal judge, you make the call here. This guy who's already lied to the court, who's disobeyed a court order, I mean, you would have us leave a federal judge with very little power to deal with someone like Dr. Newberg. Your Honor, I don't think so. Because for one thing, I mean, that is actually a concern that is expressed in many of these contempt cases. It's the Bagwell decision discussed both in the majority decision as well as in the concurring decisions. And the answer to that question is the federal courts have a high degree of power. They can refer contempt for criminal process. But he's done that and, of course, he's not in this country, so there's not much he can do about that, is there? Well, he hasn't been indicted yet. Well, but he's not here. He's not likely to come here, as you pointed out in the earlier argument. He's all over the world, but certainly not here. We're taking your time. Thank you. Is there anything else you need me to say? No, I'll come back for everybody. Thanks. Thank you, Your Honor. Your Honor, it's Bill Reynolds again. Just first, if I could address the question you asked Judge Stahl. You were absolutely correct about Newberger saying he wouldn't answer any questions. It's on page 20 of the appellant's brief, not my brief, their opening brief. It quotes from the statement that I received from Newberger's counsel after his protective order motion had been denied. And then I contacted to say, is he going to show up now? They said no. And then this is quoted on page 20. This is defendant's counsel. Until the criminal investigation is completed, skip a few lines, he intends to assert his rights under the Fifth Amendment. What's the purpose of scheduling a deposition in which your questions will go unanswered? That was the statement of defendant's counsel. That's on page 20 of their brief. It's entirely consistent with what was just represented to us, that it's in the context of facing potential criminal charges. Fair enough, Your Honor, yes. I agree. I just wanted to make sure that that point was clear just because I think it's important. I guess if you look at the bigger picture of what was going on in discovery, it wasn't just e-mails that hadn't been produced at the time of Newberger's first deposition. The court had made a very specific order, which is quoted in the papers, and I'm sure you reviewed it thoroughly. Did you ever get the documents? No. We never got the documents that were not produced. Let me say exactly what was never produced. Never produced financial statements of Biolatech AG after 2011. Never produced tax returns of Biolatech AG after 2011. Those were both explicitly ordered by the court to be produced. Never produced board minutes of Biolatech AG for after May of 2012, and then some of the ones even before May of 2012 hadn't been produced at the time of Newberger's depositions, but none of the ones after that were ever produced. Were some of them redacted as well? Yes, actually, and the documents themselves, Your Honor, are not in the record, but the redactions were heavy, and there was never any privilege log ever produced to explain any of the redactions. Those were all categories of documents that were explicitly ordered in June of 2012 to be produced, and there's no explanation or excuse for not producing them. I would suggest that the reason why they weren't produced is because they would enable AngioDynamics to investigate the completion of the merger. I mean, they relate to the period in which the merger was planned, carried out, and completed, and just to tie back to the issue that was discussed on this harm, I mean, you all asked the question of, you know, why should the district court, why should Judge Ponzer be required to believe a conclusory statement that no assets were removed? Well, not only should Judge Ponzer not believe that, but the defense totally stonewalled on any discovery relating to the completion of the merger. We have no way of investigating any of that because of this refusal to produce the documents. Another point about Neuberger didn't, I mean, he did come to the United States for the first day of the deposition, but Angio had to move to compel. His original position was he wasn't going to come to the United States even before there was any contempt sanctions or even any preliminary injunction. This is all on the record. We've filed a motion to compel, and I think that the defendant's counsel probably advised Neuberger that he wasn't going to win that motion. So they withdrew it. They agreed in writing to produce them in the United States, so that's why the deposition started in the United States. What about the issue of the damage determination for the default judgment? In other words, assume the default liability is probably entered, so all that's left in the case is damages. On your fraudulent transfer claim, was there any issue as to unpaid invoices, and is there anywhere in the record that we can look to to see how much that issue turns on, and does it make a difference to you at this point? Well, I would say that it doesn't make a difference in terms of the calculation of the damages because the fraudulent transfer damages were subsumed, and the $23 million actual damages is simply taken. I thought it was the troubling of the damages under 93A. So there's two parts of it, Your Honor. First is the actual damages of $23 million. There isn't even a calculation involved in doing that. It simply is the exact amount of the breach of contract judgment from New York. No calculation involved. Just apply that as the actual damages. For example, I'm piercing the corporate bail. The bail is pierced. Parent entities stand in the shoes. They're liable for the $23 million judgment. Then there's the troubling of the damages, and then there's the question about the fraudulent transfer, which is actually a slightly smaller amount. It's about $18 million. So the $18 million for fraudulent transfers was already subsumed in the $23 million. So does it make any difference? And what percentage of that $18 million was at issue on the unpaid invoices? I'm not exactly sure, Your Honor, but the only thing I would say about that is this issue of the invoices not being paid is based solely on, and you can see it in the record, it's based solely on a declaration of a gentleman by the name of Arthur Henneberger. He's one of the three managing agents that the defendants did not produce for the completion of their depositions either, and his failure to appear or the defendant's failure to produce them was another one of the bases for the entry of the default judgment. So Judge Ponser said, you know, okay, well, I get to calculating damages. All of a sudden I get this declaration from Henneberger saying, well, some of these invoices weren't paid, so you can't calculate the fraudulent transfer damages to include all of these. And Judge Ponser said, I mean, this guy wouldn't appear for the completion of his deposition. How can I base, how can I rely on what he says at the damages stage? And then, okay, and then Chief Judge Lynch, you asked about the troubling of the damages. So the troubling of the damages, as you said, is based under Mass General Laws Chapter 93A because the acts of the defendants were willful in knowing you had, did you have a question, Judge Ponser? Yeah, I do have a question, which is a little, I read somewhere there's some question about the location of the stock certificates. What does that have to do about this? Well, that is another collateral attack on the preliminary injunction. That was an issue that actually was presented to the panel back in 2013, and the defendants didn't present any evidence as to where the shares were located. I mean, basically the defendants argued, this is literally written in the opinion of this court from 2013, the defendants argued that ANGIO would not have been able to enforce a judgment in Germany, even without the merger, unless the share certificates of BioLitech, Inc. were located in the United States. The defendants made that argument on the preliminary injunction litigation, but did not present any evidence as to where the shares were located, even though obviously the fact of where the shares were located was within their knowledge. Then when I did the first day of deposing Boleh Skutnik, he told me, he was the general counsel for the U.S. entities for BioLitech, he told me that the shares certificates were located in his office. He kept the corporate books in East Longmeadow. So actually they were located in the United States. They were located in Massachusetts. Now the defendants then submitted a declaration from Skutnik after that where he said, well, when I testified that I said the shares were located and that I maintained the corporate books, I was referring to a copy. I think the district court found that highly incredible. And then Neuberger submitted a declaration saying they were in Germany in 2000-something. Neuberger actually didn't contradict what Skutnik said. But that was the issue with the shares certificates, Your Honor. And then just with the troubling of the damages, it simply was based on the multiple willful acts of fraud. I mean, it doesn't get much more willful than carrying out this downstream merger. Judge Ponser specifically found that any, as you sort of alluded to before, I think, Judge Kayada, in your question, any other explanation for doing this other than trying to frustrate the enforcement of the judgment, simply lacks credibility and is a fabrication. That's actually the word Judge Ponser used. He found it to be a fabrication. And this court actually found that too, or sort of, because in the 2013 decision, you said that holding off on the merger would cause little, I think it was little harm, was the word that you used in the 2013 decision. There really is no other explanation. And, of course, that means that completing the merger was actual fraud. I mean, we're not talking constructive fraud. We're talking actual willful fraud in the face of a court order. So that's why Judge Ponser troubled the damages. Does the court have any other questions for me? No. We'll hear from your brother, who reserved two minutes. And if you need to reply, we'll allow you to do that. Oh, thank you very much, Your Honor. I appreciate that. Thank you, Your Honor. Let me say that many of the things that my brother just said is an illustration of how talented he is in describing a course of conduct and attributing it to my client that really isn't borne out by a careful evaluation of the record. Let me start with the issue of the documents that were not produced before Mr. Neuberger's deposition in January of 2011. There is absolutely no evidence that those were withheld intentionally. They were produced after the deposition, after the parties agreed on search terms. The e-mails were produced. All of BioLite Inc.'s, the U.S. subsidiary's records, were completely produced. Were they redacted? No, not those. Now, what was redacted were the minutes of the supervisory board minutes, and you would expect them to be redacted because oftentimes there would be discussion of legal cases and everything else. But you wouldn't expect them to be redacted if you didn't get a privilege log that the other side could challenge the redaction side. Absolutely. And we never challenged the fact that we had to produce a privilege log. But did you produce one? No, we didn't. And the reason we didn't, Your Honor, was because we were in the process of doing all of this in 2013, and of course we were also very busy with the motions in terms of contempt and whatnot. And with the downstream merger. That's right, arising from the downstream merger. We were very busy before the district court on many, many motions. But that did not stop us from continuing to cooperate. When the magistrate judge denied our assented to motion to extend the discovery period, he stated specifically, well, if you enter into mutual agreements to continue discovery, you can do so. And we were doing that, and we were in the process of redacting the board minutes. We were going to produce them. This is in your brief. Thank you. All right. Thank you, Your Honor. Counsel, anything more? If the court doesn't have any further questions for me, I would rest on the brief. Thank you both. Thank you, Your Honor.